We will hear argument first in No. 22-1026, Martinez v. Agway Energy Services. I'll get your name in a second. Okay, Mr. Blankenship. Thank you, Your Honor and Your Honors, and may it please the Court. Agway contractually committed to providing a, quote, competitive rate, and while its contract provided that Agway had discretion, it also stated that the rate, quote, shall reflect the specified factors, namely, Agway's actual costs and expenses for providing electricity to its customers, two, other market factors, and three, a margin. As a matter of fact, on this summary judgment motion, there's no dispute that utilities are Agway's primary competitors. The defendant admitted as much in its Rule 56 fact statements and through its representatives under oath. That's at the confidential appendix at 27 and the regular appendix at 1455-56. There's also no dispute that Agway's rates are not competitive with local utility rates. Actually, could you just take a moment and describe what you mean by competitive? Because I don't really understand that to have a very concrete meaning. There are rates that are charged in a market of competitors, but does competitive mean within a certain percentage cost of the regulated rate, or what does that mean? Competitive means that the rates are commensurate with other rates that competitors charge. Well, commensurate, does that mean identical with? Well, no, Your Honor, I don't think it means identical with, and we're not arguing that Agway's rates had to be the same. Well, so that's what I'm asking. Are you saying, what does commensurate mean? Commensurate means of equal measure, right? Or, you know, within a certain specific definition of, you know, is it 5% over or 10% over? But this is the essence of your claim, that these rates were not competitive. Well, Your Honor, I may not be able to peg a certain percentage, but I'm certain that a rate that is 60% higher than the local utility rate is a rate that's not competitive with that local utility rate. Let me ask another question then also. So I'm looking at the contract language issue, and what I see is the first month will be at an introductory rate of .044 dollars per kilowatt hour, and thereafter there would be a monthly variable rate reflecting the cost of electricity acquired by Agway from all sources, and also reflecting Agway's costs, expenses, and margins and various other factors, and it says savings are not guaranteed. Is there actually a contractual commitment also to providing a competitive rate, and is there a contractual definition of competitive? There is a contractual requirement that it be competitive. That's in the welcome letter, which is incorporated into the contract by the express terms of the contract. That's at the appendix at 54. Okay. And that's where the promise that there will be a competitive rate will be charged. But then we have the more specific promises here that there will be the introductory rate and an electric variable rate that reflects these seven or whatever different factors, including a margin, transmission, distribution charges, other market-related factors, which strike me as fairly flexible in concept. Well, Your Honor, I don't necessarily agree that the representative that a rate will be competitive in a contract is any more or less specific than the other specified factors, but our expert demonstrated that each one of those, that Agway overcharged even taking into account each one of those factors. But I'm still having difficulty understanding what the basic norm is that is competitive, but perhaps... I'm sorry, but is your argument that Agway violated the contract by not basing it on those factors or that it's not competitive because of the overall rate? It's both, Your Honor. We demonstrated that the rate is not based on... When we decided the Richards case, didn't we say that it was near frivolous to say that you should compare one of the ESCOs to the utilities because the whole point is that they're not competing with the utilities, that they set their rates in a different way? Two answers to that, Your Honor. Number one, the Richards case was in the context of Connecticut's regulatory scheme, which is significantly different than New York's. As the court held in the Merkin case, in New York, unlike in Connecticut, regulators don't set the rates that utilities charge. Instead, New York utilities buy electricity every day on the open market, the same market that ESCOs participate in, and then their rate is based upon those actual costs. So the utility rates in New York, very much different than in Connecticut, are not based on regulators. And in fact, the New York Public Service Commission... But the ESCOs are still supposed to... They're subject to different requirements than the utilities, right? The point is to have an electricity provider that's subject to a different regulatory regime. In New York, the point is to have independent energy companies that compete against the ESCOs. That was the explicit statement of the Public Service Commission. We cited that in our brief. And the notion that the Public Service Commission doesn't think ESCO rates should be pegged to utilities was belied in the New York Public Service Commission. The Public Service Commission didn't think ESCO rates should be pegged to utilities. Now, granted, Agway is an exception. But then again, they created an exception for Agway, right? Well, they did, Your Honor, but that was only allowing them to participate in the market. The Public Service Commission did not say that they could charge whatever rate they wanted simply because they offered the energy guard. They did not say that there were no common law... You think that the Connecticut scheme and the New York scheme are different. But let's say if we think that the relative comparator is between ESCOs, then this would be a competitive rate, right? Because we have the evidence that says that they're 98% of the time below the median among the ESCOs, right? No, Your Honor, I disagree with that. But Dr. Felder in his report had very persuasive reasons as to why Dr. Aaron's analysis is incorrect. And it's a part of Dr. Felder's report that the district court didn't address. And he actually demonstrated that 37% of the time direct energy... I'm sorry, Agway's rates are over the median. So none of the ESCOs would be competitive, right? So if this is below the median at 98% of the time, then none of the ESCOs are competitive because the comparator would be the utilities. Well, since 2019, all of the ESCOs would be competitive because they're required. But that's different from what we're considering here, right? Even leaving aside that, there are innumerable ESCOs that have rates that are much, much lower than Agway's. They charge fixed rates, which are competitive with utilities. Can I ask about the difference in the... So, you know, we have this contract that was considered richer than the other one in Merkin, right? You know, in Merkin, the contract says it's going to be based on supply costs, right? In this case, we have this whole list of things, right? We have all sources, the electricity required from all sources, related transmission distribution charges, other market factors, applicable taxes, fees, charges or assessments, costs, expenses and margins, right? Doesn't that look like it's not just limited to supply costs? The only difference between the Merkin contract and the Agway contract is that where the Merkin contract simply says actual supply costs, the Agway contract goes through and lists those specific supply costs. That's what costs of electricity, energy capacity, settlement, ancillaries, transmission, distribution charges, taxes. Plus all taxes, fees, charges or assessments. And Agway's costs, expenses and margins, do you think those are all referring to supply costs? Everything except for perhaps expenses and margins. Yes, those are all just the specific components. Didn't you reject that argument in Richards? I mean, there was an argument there that business and market conditions were just related to supply costs. But we said that that was not right. We said that those are expensive terms. That may be true, Your Honor. So if we thought that those were expensive, then if we have a contract provision that just says it's based on Agway's costs, I mean, why wouldn't we read it the same way and say that's not limited to the costs of the supply costs? One big difference. Especially since it says there are two different elements in the list. There's the cost of electricity required by Agway. And then later in the list it says plus Agway's costs. Doesn't it imply that it's something other than the electricity costs? It may, but we accounted for that, Your Honor. The big difference between our case and Richards is that Richards plaintiffs only rely upon utility rates. If I could just interrupt. The order issued by the PSC in December 1919 gave a lot of credibility to, I may say, to my dissent in Richards. Because they found the bad actors that I alleged, and they found deception, and they found that consumers paid many billions of dollars more than they would have if they had stayed with the regular utilities. But I want to ask you about the Energy Guard program. It's not optional, right? No. It's an added value. Added value, you say. But how much does it add to the cost of each kilowatt hour? Well, we know that the actual cost to defend it was $580,000 over the entire period. That's just a fact. The actual cost of what to whom? Energy Guard. Of Energy Guard to whom? To Agway? To Agway, yeah. And the contract only allows- Is that per year? That's for the entire period, Your Honor. The entire class period is five or six years or so. So it costs them like $100,000 a year? Yes, Your Honor. And could you convert that to how much money they added to the bills because of this alleged benefit? Well, their expert claimed that they added, they based the rate on Energy Guard value, not just the cost. I suppose you could break it down into kilowatt hours. It would be pennies. The thing is that the consumers and small businesses were paying for this benefit that they thought was free, according to the welcome letter, includes the peace of mind and added value. They were never told that it's going to be part of the costs of the utility bill. They never told that, are they? Absolutely not. And if you look at the customer service scripts and the verification call, the opposite is the case. The customer service script says other companies charge you $50. And the next sentence would be, and we charge you nothing. But they can't say that because they did charge them something. I'm not in the mind of the person who wrote that welcome letter, but I think that the reasonable implication is that the Energy Guard is an added value. Can we specify the cost that the consumer actually ended up paying by virtue of its inclusion of the value? You're saying about $100,000 a year was the cost to Agway of providing the service. But do we know how much of that cost was translated into an increase in rates to the consumer?  All we know is what their actual costs for supply are, what their overhead costs were, which Dr. Felder accounted for so that even if expenses are business expenses, unlike in Richards, we accounted for that. And even accounting for overhead, even accounting for the cost of Energy Guard, accounting for a reasonable margin, consumers were still overcharged for $30 million, and that's a significant difference. But the $30 million that you allege is not related specifically to Energy Guard, right? This is just the overall noncompetitive rate theory that you have, right? That's right, Your Honor. So the way that Agway sets its rate is it takes its actual cost and it tacks on a huge margin, which presumably part of that is their profit. Part of it is to account for the $580,000 or $100,000 a year in Energy Guard. And if they're relying upon the use of the word margin to justify charging consumers way over what the utility costs, then that just proves our duty of good faith and fair dealing claim, because the inclusion of these huge margins means that the rate no longer reflects. So what were they entitled to charge in your view? Well, Dr. Felder opined that a reasonable margin of 5% or 10% would have been okay. 5% or 10%? So 10% would have been okay? Well, I think that's a jury question, and Dr. Felder was demonstrating what the math would look like. It's a jury question as to what a reasonable margin is? What a commercially reasonable margin goes to the question of the duty of good faith and fair dealing. If they're charging a commercially unreasonable margin so high that the other – that the rate no longer – But they're acting in bad faith. Pardon me, Your Honor? So the idea would be that they're acting in bad – they're violating the covenant of good faith and fair dealing because they're charging a margin that no one would consider to be a reasonable one. That's the idea. Yeah, and the margin is so high that it eclipses all the other factors. If, in fact, the overall cost is below the median among ESCOs 98% of the time, what's the evidence that would allow a jury to say, well, this is just not competitive? Well, again, Your Honor, the – well, first off, we don't – You're saying it's because of the connection between their input costs and the amount they're charging that they could have charged even less, right? That's certainly – But competitive is a comparative term. It's about what their competitors are charging. It's not about whether they could charge even less, is it? Well, understood, Your Honor, but the record is clear here that the primary competitor of Agway is the utility. If it's the case that they are never, ever competitive with their primary competitor, then it can't be that there's no material question about whether or not they charge a competitive rate. And the point about the Agway being competitive with ESCOs presumes that Dr. Aaron, their expert report, is pristine. But the district court never addressed Dr. Felder's refutation of that. He demonstrated that, in fact, there were 37% of the time that Agway's rate was actually above the median, that there were always a number of ESCOs that charged substantially low rates. And Dr. Aaron cherry-picked. She didn't include fixed rates, which are a huge percentage of the ESCO products available. Can I go back to the energy guard thing for a second? So you say that somebody might say because it says you're automatically enrolled in energy guard or getting it as an added value that it would come without an additional cost. But don't we read all of the pieces of the contract together? So if the contract says that the variable rate is determined by Agway's cost, isn't the cost of providing energy guard a cost of Agway? It may be. I mean, I think that begs the question, Your Honor. The other part of the contract says it's an added value, and there's evidence that Agway thought it was an extra added value, not something that you built in the cost. But an added value could be we're going to give you the basic electricity service and we're going to give you the added value of this other service. It doesn't mean that there's not a cost of providing that service, does it? It could be, Your Honor, at best. That's an ambiguity. Why is it ambiguous? So to me, you know, if it says we're going to base the variable rate on Agway's costs and there's a cost of providing the service, it seems like that's a factor that goes into the rate. So why is it ambiguous? It's ambiguous because you think we should read the definition of variable rate only to be the electricity component and not the other piece of it. I think you should read the contract on its basic terms. The welcome letter, which is part of the contract, says that energy guard is an added value. I think that one could reasonably interpret that added value to mean something above and beyond what you're getting for the price that you're paying. If you can provide the energy guard service and spread the cost among all the subscribers so that you're getting it at a relatively low cost, is that not also an added value that comes by packaging it together? It's like bundling it together. You get an added value of this program, the energy guard program. I don't think that that's necessarily the way a reasonable consumer would interpret it. And, again, if our interpretation is reasonable and the defendant's interpretation is reasonable, then there's an ambiguity there, and that's a question for the jury to decide. And your interpretation is reasonable because you're saying that the term added value means without a cost to you. That's correct. When you say you're giving somebody an added value, you're saying it necessarily means that it doesn't have a cost to you. I think that's right, Your Honor. It says you get the additional piece of mind. And if you look at the customer service – I mean if I have – if I have – you buy one and you get another one for half price, am I not giving that consumer an added value? At half price, which is – Right, so they're paying a price, but they get an added value, which is they're paying less than otherwise. They get an added value in that kind of a deal. But the contract didn't say that the energy guard would be provided at half the price. No, I understand, but I'm asking about the term added value. Like it would be descriptively accurate to say if I'm giving you something that has a benefit to you, even if you're paying a cost, like you're still getting – you might be getting an added value for being my customer, right? I think it would be entirely reasonable to interpret the phrase, particularly in the way that it's interpreted by Agway itself when they tell customers that other companies charge you $50 for this. But we're giving it to you as an added value. I think the clear interpretation there is that it's not something – Can I ask you a sort of preliminary question about diversity in this case? So originally you had diversity because you have the New York customers and the Pennsylvania customers, right? That's correct, Your Honor. But the Pennsylvania customers have now litigated these claims against Agway over their contracts, right? Your Honor, I – And that's gone to the merits, right? It's gone to district court in the Western District of Pennsylvania, and there's a Third Circuit decision about it. It's the same class of people, right? It's the Pennsylvania customers of Agway. It is, but the Brown case was a separate case, and that wasn't – that class wasn't certified. So that's just a decision on that individual case. So you're saying the Pennsylvania customers wouldn't be precluded from pursuing this other suit because the class wasn't certified? That's correct, Your Honor. Any time a class isn't certified and a plaintiff loses an individual claim, assuming – So you're saying only the lead plaintiffs would be precluded? That's correct, Your Honor. Okay. And even leaving aside the plaintiffs, the Pennsylvania issue, we had diversity. It's important to remember we filed this case in Pennsylvania. And so the CAFA rules that require more than two-thirds jurisdiction only applies if the original jurisdiction is where the defendant is, and that's, of course, in New York. And so that local exception doesn't apply. And there is no question that some members of the class no longer reside in New York. And, of course, when we filed the case – Is there no question about that? I mean, I understand that you allege that, that there must be some people who no longer reside in New York. But do we know that to be true? I don't know that that issue was litigated, but it was also the case when we filed it. But it's jurisdictional, right? So it would have to be resolved, right? Well, I think the question is whether or not we had jurisdiction when we filed the case. And when we filed the case, the case included Pennsylvania customers. And so the fact that, you know, they may have been carved out doesn't change that jurisdictional analysis. It's a question of when it applies. So you're saying if we lose diversity later in the case, it doesn't matter because you originally had it? I think when a – well, first, Your Honor, I don't think there's any evidence in the record to indicate that there isn't one single person who was an Agway customer who no longer lives in New York. If this were really an issue, this would be easy to decide because Agway has customer accounts. But it's beyond capital that one person had a vacation home in New York and lived somewhere else. Or that they've now moved to Florida. Or, you know, there are tens of thousands of customers. It only takes one when the local exception is not applicable. Okay. Well, I'll see what the other side has to say about it. You've reserved time for rebuttal, so we'll hear from you again. But let's turn to the affilee, Mr. Coyle. Thank you, Your Honor. I do want to start with a lot of things that we all agree on. Can you speak into the microphone? My apologies, Justice Kagan. Thanks. There's a lot of things that we agree upon on this, which is that the terms of the contract govern this. The terms of the contract, as Your Honors went through. Do you believe that the contract is designed to allow consumers to believe that the Energy Guard program is free? No. Well, explain the sentence that opposing counsel just read. Other utilities charge you $50 a month, but here it's an added value. Doesn't that imply that they're not paying for it? No, that's not part of the contract, and that's not part of the record below here. That is from a proposed script that is, according to plaintiff's own complaint, excluded from both the GBL claim and the breach of contract claim. Plaintiff's contract. Okay, but the contract materials, the cover letter and the brochure and so on, do describe it as an added value. You're automatically enrolled and you get this added value. So why doesn't that imply that they're getting it at no additional cost? Well, because of the language at the end of the bracket of things. The contract provides for three separate categories of stuff. Agway's energy costs, the various distribution and regulatory costs, and then it's profits, margins, and overhead. And nobody gets anything for free. Your Honor talked about the example about buy one, get one half price. You're not getting ripped off if you buy one. It's built into the price for the consumer. But don't the consumers think they're getting this for free? No. Isn't that the goal of your bulkheading materials? Assume arguendo that they're getting it for free. The reality is, as undisputed, that in all of the comparative markets, comparing Agway's prices for electricity plus energy guard for free, it's still cheaper than the median price in 98% of the time of the ESCOs. It's still cheaper than what? Than ESCOs who do not give you anything other than electricity. What about compared to the existing utility? Doesn't it turn out to be more money than these people would pay if they stayed with their utility? But this is apples to oranges. You talked about the purposes of deregulating the market, the prior matters for Richards and Merkin. That's one of the reasons for the deregulated market. According to the Public Service Commission itself, in the record in Reset Order 2, I'm going to read from page A1077. The commission expected that allowing ESCOs to market commodity to customers would lead to productive innovations. And they were disappointed to find that it didn't lead to that, and what it led to was consumers being ripped off. With the exception of Agway. Well, Agway just got an exception because they had this program that was energy-related. A lot of other people wanted to give free baseball tickets, credit cards, whatever. But this was energy-related. But there's no evidence in the PSC report of December 1919 that it was a benefit to consumers, just that it was energy-related. No, that's absolutely untrue. Well, tell me where – I have the report here. Tell me where it says in the report, the full report, that there was a benefit to consumers from this program. Sure, and I'm reading from page A1056. What page, I'm sorry? 1056. I believe that's line five of the appendix. I'm afraid I left it on my desk, I think. Okay, read it to me. The commission provides one exception to these three criteria and allows Agway a limited opportunity to continue to offer its energy guard service due to the specific credible evidence Agway submitted regarding the energy-related value of this product. Right, so it's energy-related. That was very important to the PSC when they issued this new rule, that anything you add has to be energy-related. Hence the inside wiring. But it didn't say anything about the savings, and you added that cost onto the monthly cost to the consumers, didn't you? Agway added its costs for its rent, for its overhead, for the energy guard repairs, for the regulatory fees. These were Agway's costs. So I heard from opposing counsel that the cost of the energy guard program from its inception to today was $580,000, is that? Absolutely false. That was not correct? That's absolutely incorrect. What is the cost if you know it? I don't know the cost because that was never the focus of their matter here. Well, I'm asking about it. The answer is this. Mr. Blankenship is looking at the cost of repairs and adding those up and saying that's the cost of energy guard. Agway had to retain and hire thousands of repair people, had to market this across the entire state. Thousands? Thousands. New York covers the service territories of the entire state. You have 24-hour coverage for energy guard. So if your furnace, if you're on the natural gas or your air conditioning- are the only things that are included in energy guard. So if your furnace goes out, you're out of luck. No, that's not true. Energy guard covers natural, Agway sells natural gas and electricity. This case is about electricity, and we're talking about this. The wires in the wall and your central air are part of your electricity. That's all that's covered on the electricity program. Correct. Isn't that correct? Yes. If your wires break in your wall and your power doesn't work, you call Agway and a service technician, no matter where you live- I know. How often do wires break in the walls, you know? That was an old deal that the AT&T used to charge you to protect your inside wiring. People paid for years, and you know, the inside wiring hardly ever went bad. I had to hire a contractor to fix it myself, so I know they happen sometimes. Now, I will tell you that you talk about distributing charges. I have life insurance. I'm still alive. My company hasn't ripped off me and my family. There are 24,245 customers of electricity in the state of New York from Agway. Each of them have $2,000 of zero deductible coverage today. Agway could get hit with a repair bill today of $48,490,000 and get hit again on January 1st. So you're saying it's an added value because you're basically requiring everybody to opt into this insurance program, and that spreads out the cost among all of the customers. And so therefore they have coverage if their air conditioner breaks or their wiring breaks. That's the added value that's being provided. With the exception of required customers to do this, Agway does not require anybody to stay here. There's no contract. There's no termination fee. You can leave. So, yeah, they don't have to buy electricity from you, but if they do buy electricity from you, they have to be part of the Energy Guard program. Is that not right? That is correct. So they can't opt out of Energy Guard. They're required to get Energy Guard. I don't know why somebody would opt out of that benefit, but if somebody wanted to, I suppose they should. At the same cost, maybe they would want to, right? But then they'd be paying for electricity only without Energy Guard, a price that is cheaper than 98% of the market. Can you tell me what – Well, you say 98% of the market, but what do you have to say to opposing counsel's argument that the relative comparator is the utilities, and that even though we said the relevant comparator was ESCO's in Richards, the New York regime is – regulatory regime is different from the Connecticut one? Then the Public Service Commission, as according to the recent Order 2 that counsel and counsel's expert talked about as telling you why you should compare it to the utility, disagree. When the entire purpose of a three-year hearing and creating thousands of volumes of testimony and witness after witness is that everybody, every ESCO in the state of New York cannot charge more than the utility except that way. But that wasn't the rule with Richards when Richards decided they could charge more than the utility, and in fact they did, didn't they? That's correct. I'm not going back and revisiting to re-argue Richards. But the court in Richards upheld direct energy charging more for electricity only than the utilities. Direct energy on the charts from our expert charged more than Agway did for electricity. How much does Energy Guard add to the monthly bill, an average monthly bill? It's not able to be added in that sense. It's not calculated in that sense because this is an energy product requiring repairs and repair services and everything. But you know what it costs. You just told me you know what it costs. You know how many customers you have, so you divide the cost by the customers and tell me how much it adds per month. Agway adds all of its costs as required and permitted by the contract. I want to know what I, as Jane Consumer, pay for Energy Guard if I'm one of your customers. I will tell you what you pay for Energy Guard and all of Agway's costs in total. So you're not answering my question. What does the Energy Guard program add to the cost of my bill as one of your customers? I don't know the answer to that, and that's not part of the record, and it hasn't been part of the case to this point. Well, you put in evidence that, you know, your overall rate is, if the relevant comparator is the ESCOs, it's below the median 98% of the time even when you offer Energy Guard. Correct. Right, and so you're saying that given that evidence, you're providing a competitive rate. So if you were gouging on Energy Guard or something about Energy Guard that made it noncompetitive, it would be the obligation of the plaintiffs to put in that evidence, right? Absolutely, and regardless of whether Agway is hypothetically something I don't agree with, charging more for Energy Guard than anything else, then all the other ESCOs are gouging multiples above that because they don't give you Energy Guard for free or for anything. So the value, the benefit, the insurance price. Can I ask about the term variable rate? So the variable rate, the contract says the variable rate will reflect all of these inverted factors. Yes. And you say, well, when it gets to cost, it must be all of the costs of Agway. But, you know, it's the variable rate for electricity.  And if Agway was providing a separate thing like this insurance program for wiring and air conditioning, it wouldn't be included in the variable rate for the electricity? No, because when you read the plain language of the contract, the first portion says the cost of electricity acquired by Agway from all sources. And then it has a parenthetical, including, and it lists the items. That's Agway's cost for acquiring electricity. It then says end Agway's cost, expenses, and margins. That cost, expenses, and margins doesn't refer just to the cost to acquire electricity because that reading would require you to write out half of this provision of this contract. So Energy Guard is included in the overall umbrella of costs? Yes. And you can't break down and tell me what part of the bill is related to the Energy Guard program? I will say it differently. The plaintiff failed to establish for the purposes of defeating summary judgment that Agway charged excessively for that amount of devices. But you're Agway and you can't tell me what part of the bill. Can I move on to another point? Yes. This petitioner, the original petitioner who unfortunately died, got one month at 4.4 kilowatt per kilowatt hour, right? .44 cents per kilowatt hour. And then got a second month at the same rate. Why didn't they get a second month since by all rights you could have made it variable after the first month, which is all you promised in your contract? We agreed to set it at our discretion and give them a promise. The reason she got more than that is because New York and their central utilities, it's a complicated question, they're not always able to switch you on the dime. I see. So it wasn't to lull her into a lack of awareness about her utility bill, which is what happened in direct energy. Absolutely not. And the problem you had in direct energy was the idea of this, and I'm referring to Judge Pooler from your dissent and your questions, this glide path. The direct energy at the end of this fixed term lulled people into confusion. Right, the glide path. So there wasn't a glide path here. You gave her the promotional rate for two months and then the rate became variable. Absolutely. And at that point, Mrs. Gonzalez was free to drop without any holdup charges, fees, assessments, costs, anything else whatsoever. As a matter of fact, during that period, she could have claimed that she had her energy guard, she could have used energy guard and used $2,000 worth of services in that first month. Of course she didn't because it didn't break. And I'm still alive. How soon could she have canceled this contract with Agway? The day she enrolled. The day what? The day she enrolled. Under this contract. There's no period where you cannot cancel? Absolutely not. You can cancel at any time without fees and costs, and that's in the contract. So, you know, this was a good idea at the time it was thought about, alternative energy, because competition didn't exist with the legacy monopolies. But it turned out to be not a good deal for consumers. That's what the Public Service Commission found. $1.6 billion was paid. I disagree because I agree that of the entire industry, you can make that broad statement as you're talking about this, but the PSC in 2019 and its order and reconsideration hearing, and to this day, allows one company to charge the rate. We're not talking about an abstract rate. We're talking about the rate that issue exists. First of all, are we bound by this exception by the Public Service Commission illegally if we find that this is inappropriate? Are we bound by what the PSC said? I don't believe you're bound by it. Neither do I. That's good to hear that you agree. So they gave an exception because you presented allegedly some evidence showing that this was a bargain for individual consumers? I would say not allegedly. According to the recent order, too, Agway provided objective evidence to demonstrate that its costs for Energy Guard are commensurate to the value of customers. It's not alleged evidence, and it's not hypothetical. I guess what you would say about the PSC is we're not bound by their determination, but the PSC decided that a lot of the flexibilities were not a benefit to consumers, and they specifically decided this was a benefit to consumers. That's a piece of evidence that maybe this is a good deal for consumers. That's right. But we're not trying to determine whether it's a good deal for consumers. We're trying to determine whether it's a breach of an actual contract. Well, that's right, and I think it's relevant because Plaintiff's argument in its briefs is that the judge below was wrong for saying you cannot compare the price to the utilities. That's not what the judge said. The judge says you cannot compare Agway's price solely. Every time Plaintiff writes in its brief in an argument, they left the word solely out. There's no question that the utility is a competitor in the broad sense, but under the purposes of deregulation and as confirmed by the PSC, one of the benefits was the idea of offerings that utilities cannot offer, and that's what's in the case here. Energy Guard, that might be justification for you having a higher price than others. Correct. What about the argument that opposing counsel made that even if you accept your interpretation of the contract, that you have all of these overhead costs and even Energy Guard and even a reasonable margin, that you're still overcharging? Plaintiff has yet to establish that and rebut this when 98 percent of the market that does not include- Well, 98 percent of the market is in comparison to the ESCOs, right? ESCOs and the utility. It's more expensive than the utility in nearly every period. Not cheaper, not more expensive than the utility in every, but most of the time more expensive than the utility. But again, that's because every other person in that comparison doesn't give you what Agway does. But that's not exactly the question, right? So if you're having an unreasonable margin, so the argument is like you could charge even less. So is your argument that, well, it's still competitive overall, so it wouldn't be a breach of the contract? Or would you accept the argument that if you were what they call price gouging, you were charging just a very large margin, that that would be a breach of the contract, even if it's still competitive in comparison to other offerings? Because this contract allows Agway to set the price in its discretion and to include its cost, overheads, and margins, the question becomes did Agway properly exercise that discretion in setting this price? And the way that this course said this in Richards and all the other decisions about this were by comparing it to the market. And the comparison to the market is, again, not an apples to apples because we give them something that they don't. But it's not just interpreting the word competitive. We're also interpreting the various factors, right? So the contract says that you're going to set the variable rate in your discretion, but then it also says that the variable rate is going to reflect these enumerated factors. And so if you look at the enumerated factors and looking at what your costs are on each one of those and the outcome of the rate is much higher than accounting for all those factors plus a reasonable margin of 5 to 10 percent, wouldn't that be a breach of the contract? Well, first of all, this is summary judgment. We had five months and five years of discovery. That's why I was inviting you to engage with the evidence. You said they had evidence that actually you were still overcharging based on the factors, and I wanted you to respond. They didn't. And as a matter of fact, Dr. Felder, the stricken Dr. Felder report, one of the reasons it was stricken, is Dr. Felder never opined what the profit margin should have been, full stop. He has a report that says it could have been zero, it could have been five, or it could have been 10. In that connection, can I ask you, does ACWAE make money on the Energy Guard program? That is, do they pay less than they earn by putting it on everyone's bill? ACWAE makes less, makes a profit on its total cost, which includes Energy Guard. So they make a profit on this? Including Energy Guard. They make a profit on the Energy Guard program because they treat it as a cost of acquiring energy when it's not that at all. It's not a cost of getting power from the incumbent utility. It's a cost that you decided to add, a profit center on consumers' bills. If you took ACWAE's contract and you took a marker and you eliminated the entire second half of the pricing structure and eliminated that it includes ACWAE's cost, expenses, and margins, I would agree with you, because then it is adding the cost into the cost of electricity by acquiring more sources, which would be a breach of the contract. But it doesn't do that because that's not what the contract says. Just to go back to the Felder report that you mentioned a moment ago, it's not that his methodology was unreliable. You're just saying that he's not focusing on the right things. He's focusing only on utilities. He's not explaining the basis for some of these factors. But it's not that he's – it's inadmissible, is it? Well, I think there's a couple of questions to it, and there's a couple of layers to this, and I apologize. I'm going to try to unpack this. The question Mr. Blankenship said was that Dr. Felder opined that a 5% or 10% profit margin was appropriate. He didn't. He actually said he has no idea what any other ESCO charges for a big surplus profit margin, including the ESCO he worked at for 10 years. He has no idea what the prices are for anybody else in the market. The question for an expert admissibility of a report is does it go to any of the issues in the case, and where Dr. Felder has nothing to opine as to the reasonableness of the discretionary rate set by ACWAE because, by his own admission, he has no idea what any other ESCO charges and he has no idea what any other ESCO's profit margins are. So the hypothetical of could ACWAE gouge here but overall still be good and comply with the contract, there has been no evidence presented in this case to show that. So I can't just prove the negative, but this is summary judgment. We're going back to a case from 2017. We had expert discovery. We had volumes of paper discovery. We went through all this. And the question here was did the court properly grant summary judgment by finding that plaintiff failed to present that? And when Dr. Felder had nothing to point to to talk to what profit margin should have been charged, had nothing to talk to what other ESCOs in the marketplace to talk to the reasonableness of the total fee, so it's either the components, as Judge Menasca, you were just talking about, or the totality of the discretion, then it does not go to any of the issues in the case. When the district court is deciding on summary judgment, the district court considers the Felder report, right? Correct. But this motion to strike is later. So it's not as if it wasn't before the district court and he refused to look at it. He just thought that it wasn't persuasive. It was in front of the district court on the motion. It was part of the motion, the cross motion. It was a motion to certify class by summary judgment. And on reconsideration, the district court went back and said we're not going back and reversing Judge Felder. I'm sorry, reversing the part of the decision to strike Dr. Felder's report because having found that the breach of contract wasn't established and the GBL violation wasn't established, there's no reason to bring in Dr. Felder back. Can I ask about the diversity question that I was asking about earlier? So the Pennsylvania customers have had this separate lawsuit. Are they precluded from pursuing the claims here? No, and I do want to clarify something. Mr. Blackchip misspoke. This matter was originally filed in Delaware. Right. This matter was in Delaware. Yes, I understand that. He said Pennsylvania. The Pennsylvania case only was dismissed as to James Brown, the named plaintiff in that case, and that went up. So you don't think it would affect the Pennsylvania customers, so they're still in this case. I don't think it's precluded as a matter of law. Okay. I do believe, though, that the Third Circuit deciding the exact same contract on the exact same issue and on the exact same case. Yes, on the merits, you think we'd be creating a circuit split if we decided in a different way. But there's no problem with jurisdiction. There's no binding jurisdiction because the class was not certified. And thus, if the class had been certified in Pennsylvania prior to summary judgment, then that class would not be present here. But that didn't happen. Okay. Thank you very much, Mr. Coyle. We'll turn back to Mr. Blankenship on rebuttal. Thank you, Your Honor. Let's first start by talking about the record of the cost of Energy Guard. I'm looking at appendix page 358, which is part of Dr. Felder's report. He lists the actual expenses for Energy Guard, which are based upon the defendant's records for electricity, $583,000. Maybe Mr. Coyle was thinking about the cost for gas, which is $5.4 million. But these are based upon Agway's own records. And Dr. Aaron, their expert, never refuted. What is the citation it's based for? A358 is part of Dr. Felder's report. And that's where he lays out the specific cost of Energy Guard. That's based upon their own records. So I'm not really sure why there's a dispute about that. And does anyone ever break out of the cost to each consumer for the Energy Guard program? I asked opposing counsel several times, and he said it was never part of the case. We don't know. We're only Agway, but we don't know. Do you know? We don't know, Your Honor, because Agway doesn't really disclose what they count in their margin. So we don't know what makes up that cost element in what they're allowed to charge. But an ordinary consumer might really think that it's the cost of acquiring the energy. Correct? Absolutely, Your Honor. I think that that's right. And even if a consumer thought that expenses. Excuse me, I'm sorry. Why would that be so? I mean, as your adversary pointed out, in the contract language, there is one provision for the cost of electricity acquired by Agway from all sources. And then there's a further provision saying that the charges relate to Agway's cost expenses and margins. That seems like a broader statement than just the cost of electricity acquired, which is already addressed. Isn't that right? Your Honor, I think for the same reason that Judge Pooler felt that business and market conditions were also related to market. That could be true. But even if that's the case. Yeah, but maybe that's a reasonable argument, but Judge Pooler was in dissent, right? I understand, Your Honor. My only point. But even leaving aside that question, even if expenses, costs, and margins are separate from the actual supply costs, Dr. Felder accounted for that. He looked at their records and determined what their overhead is, what their margins should have been. And that's kind of an important point, Your Honor. What does that mean to determine what their margins should have been? So your opposing counsel says he doesn't give a basis for what the margin should be. And if we have the evidence that they submitted that says that they're below the median price of 98% of the time, that overall it looks competitive, they're not considering a factor that's impermissible, so we know that they're allowed to include costs. So why would it matter the amount of the cost as long as the overall rate is still competitive in the way that they promised it to customers? Well, Your Honor, I think that Dr. Felder is quite persuasive in refuting Dr. Aron's analysis regarding competitiveness. That's a part of his report that the district court never addressed. He demonstrated that Dr. Aron was just wrong about the math. Well, the district court credited Aron and not Felder, right, on this point about the 98%. So that's a factual determination. When a court doesn't consider opposing expert – well, I don't know whether the district court considered it or not. It's not addressed in any of his papers. And I think it's also the case, Your Honor, if you look at the actual – I'll just accept that factual determination for a moment. So, like, if we have this scenario where the rate is 98% of the time below the median and so that looks like it's competitive, it's not including factors that aren't allowed to be included under the contract, but you're still saying, well, it included the factor to an extent, to too much of an extent because it includes too much of the cost in the rate or something. So what if the contract says that the cost can only be included to a certain extent? But where would the breach be? So if the overall rate is competitive and there's no factors that are being considered that are not impermissible – sorry, that are impermissible, where's the breach? Well, Your Honor, the preface is not supported by the record. We know that the overall rate isn't competitive because it's not competitive with its main competitor, which is the utility. And importantly, Dr. Aron only looked at other ESCOs' variable rates. They didn't consider other ESCOs' fixed rates, which are a huge percentage of the market and which are still allowed. But the claim for breach of contract is about the definition of variable rate and how they're going to set the variable rate in the contract, right? Isn't that the relevant provision for the breach of contract? Those are the factors. I'm talking about the competitiveness aspect. If you want to just look at the factors, again, Dr. Felder accounts for every single factor. There's no dispute that he accounted for overhead. There's no dispute that he accounted for margin. So you're saying really it's not about the language of the contract. The district court should have credited Felder rather than Aron. Well, Your Honor, I think at the very least there was a material dispute about whether or not the rate is actually based upon the factors. And Dr. Felder wasn't just making up numbers. They're all based upon the factors. Wait, now there's a dispute about whether the rate is based on the factors? So the district court thought, well, you can include all these factors because it's really broad language. It includes market-related factors, costs, expenses, and margins and all of these things, right? So there's no dispute about whether it's based on the factors. The district court said basically consider all. Like it's pretty open-ended, right? So your claim is that's not the way the contract should be read, right? Or if it's read that way, then we're back to the duty of good faith. But if it's read that way, your claim is not that it's being based on factors that are impermissible. Your claim is there's too much of the costs that are being included or the margin is unreasonable or something like that, right? That's right, Your Honor. So there's not really a dispute over whether it's based on the factors. It's a dispute over how it's all calculated together. Leaving aside the claim of competitiveness, any business could say we're going to be basing our rate on five factors plus a margin and then just charge an infinitely high margin. It cannot be the case that a company can ignore all of the factors except for the one that it has discretion, charge as much as it wants for that one. Well, isn't the market supposed to bring it back into line? I mean if you want to sell, you have to be competitive. And so the notion is that the market will realign the pricing and force the company to comply when you're not in a regulated situation, right? Well, Your Honor, I don't think that's relevant to the breach of contract claim. The breach of contract— You said the breach of contract claim is that there was an obligation to be competitive. But we haven't really ever pinned down, in my view, what it means to be competitive other than it ought to be the lowest price or equivalent to the regulated price, which seems to me to defeat the basic purpose of creating an unregulated market. Well, in Connecticut, that may have been true. But in New York, the Public Service Commission always intended that ESCOs would compete against the utilities. But that doesn't mean they didn't impose an obligation to apply and charge only the regulated rate, did they? No, of course not, Your Honor, and that's not our argument. And that was the argument in Richards where the plaintiff said you had to charge— I understand, but you haven't defined, to my satisfaction anyway, what it means to be competitive other than that basically they have to charge at the same rate or less than the utility. That's most certainly not our argument, Your Honor. So what is it exactly that they had to—what is it exactly? What were they allowed to charge? I may not be able to define what a competitive rate is. I can tell you what a competitive rate isn't. But this is the essence of your claim. You're saying this was not a competitive rate. That's correct, Your Honor. And so why is that? Because it was 60 percent higher than the main competitor. Whether or not a rate that's 5 percent too high or it has to be at or below is not the question. The question is, is a rate that's 60 percent higher than your main competitor competitive? That the regulated utility. Yes, Your Honor. And in New York, that regulated utility and by the admission of the defendant under oath, they are the primary competitor. That's what makes us different from Richards. The Richards defendant never admitted that the utility was the main competitor. It involved Connecticut where utility rates are specifically regulated, and whereas in New York, they're literally based upon market costs. Like when utilities charge rates, they just go buy electricity on the daily market just like ESCOs can do, and they charge that rate. That's why the Merkin court held that the utilities are germane to determine whether or not a contract is based on actual supply costs or market conditions. We know that defendant's rate is not. Well, they're not denying that it's germane because they are a competitor, right? But the Merkin court was relying on the contract that says this is going to be based just on supply costs, right? Well, that's right. We don't have contract language like they had in Merkin that says the rate is just based on supply costs. Your Honor, I don't think the contract here is that different from the one in Merkin. Now, true, the Merkin contract just generally said actual supply costs, and Agway goes to great lengths to describe, to break that down. I'm sorry. The contract in Merkin says that the rate is based on Zoom's actual estimated supply costs, which may include but not be limited to prior period adjustments. That's right, Your Honor. Our contract says the variable rate shall each month reflect the cost of electricity required by Agway from all sources, including energy capacity, settlement, ancillaries, related transmission and distribution charges, and other market-related factors, plus all applicable taxes, fees, charges, or other assessments, and Agway's costs, expenses, and margins. I mean, that is a lot more than just the actual or expected supply costs. And then it also highlights, if I may, that savings are not guaranteed. And we've never argued that savings were guaranteed. But as my colleague has just set forth, the language is significantly more expansive than the language in Merkin. I would both respectfully disagree. And even if it is expansive, we accounted for that. Everything before cost, expenses, and margins are actual supply costs. The taxes that they pay, the assessments they pay to the ESCOs, the distribution charges, those are all their actual costs. That's just a detailed list of actual and supply costs. I don't know. Other market-related factors? Well, Your Honor, in Richards, this Court held that market-related factors means costs of supply. And that's not the dissent. That's the main holding. And that's one big difference here is that the catch-all term business factors, which Richards said may be applied, not shall be applied, is not relevant here. And leaving all that aside, we account for their actual costs. We account for their actual expenses. And we account for what a reasonable margin would be. And contrary to Mr. Coyle, I'm going to cite the record again, in A360, Dr. Felder opines that a 5% or 10% would be a reasonable margin. So, counsel, from what I've learned today, it appears that the Energy Guard program became a source of profit. That is an income stream that gave them more money than it cost them. Is that correct? I think that's a fair assessment, Your Honor. Their expert, Dr. Aaron, opined that the reason why it was okay to charge $30 million over their actual costs was because they offered Energy Guard, which has a value, which is substantial. I could be persuaded it was value if consumers could opt out. That is, we're giving you this thing, but you can opt out of it and your bill would be less. But that's not a feature of the program, is it? It's not, Your Honor. And the contract doesn't allow them to charge for value. It only allows them to charge for costs. And you can't justify $30 million in overcharges on a $580,000 cost. They just tacked on a $30 million in margin. Now, maybe they were technically allowed to do that. But in so doing, they violated the duty of good faith and fair dealing because the rate no longer had any reflection of the other costs that the rate shall be based upon. It can't be the case that if a company has discretion that's cabined by a competitiveness requirement and the requirement they meet these certain factors, that if one of the factors, it says the word margin, that a company can charge whatever it wants and not violate the contract or the duty of good faith and fair dealing. I think we have that argument. Thank you very much, Mr. Blankenship. The case is submitted. Thank you, Your Honors. I appreciate the court's attention.